**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **ADRIENNE CURRY,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 2:12-CV-0608-SLB** |
| | ) | |
| **ROBERT WILKIE, Secretary of United** | ) | |
| **States Department of Veteran Affairs,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION

This case is presently pending before the court on defendant's Motion for Summary

Judgment. (Doc. 58.)[1] Plaintiff Adrienne Curry has sued defendant Robert Wilkie, Secretary

of the United States Department of Veteran Affairs [hereinafter the VA], alleging that the VA

discriminated against her on the basis of her disability and that it retaliated against her for

complaining about discrimination. Upon consideration of the record, the submissions of the

parties, the arguments of counsel, and the relevant law, the court is of the opinion that

defendant's Motion for Summary Judgment, (doc. 58), is due to be granted.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), summary judgment is appropriate "if the movant

shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[1]Reference to a document number, ["Doc. ___"], refers to the number assigned to each
document as it is filed in the court's record. Page number citations refer to the page numbers
assigned to the document by the court's CM/ECF electronic filing system.

judgment as a matter of law." Fed. R. Civ. P. 56(a); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *see Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). Once the moving party has met its burden, the non-moving party must go beyond the pleadings and show that there is a genuine issue of fact for trial. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 324 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

> A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:
>
> > (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
> >
> > (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1); *see also Clark*, 929 F.2d at 608 ("it is never enough simply to state that the non-moving party cannot meet its burden at trial").

In deciding a motion for summary judgment, the court's function is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. "[C]ourts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.'" *Scott v. Harris*, 550 U.S. 372, 378 (2007)(quoting *United States v.*

*Diebold, Inc.*, 369 U.S. 654, 655 (1962)(per curiam)).  Nevertheless, the non-moving party "need not be given the benefit of every inference but only of every reasonable inference." *Graham v. State Farm Mut. Ins. Co.*, 193 F.3d 1274, 1282 (11th Cir. 1999)(citing *Brown v. City of Clewiston*, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988)); *see also Scott*, 550 U.S. at 380 ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment.").  And, "when conflicts arise between the facts evidenced by the parties, [the court] credit[s] the nonmoving party's *version*. [Its] duty to read the record in the nonmovant's favor stops short of not crediting the nonmovant's testimony in whole or part:  the courts owe a nonmovant no duty to disbelieve his sworn testimony which he chooses to submit for use in the case to be decided." *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005)(emphasis in original); *see also Jones v. UPS Ground Freight*, 683 F.3d 1283, 1296 (11th Cir. 2012)(quoting *Evans*).

## II. <u>STATEMENT OF FACTS</u>

Curry began work at the VA hospital in Birmingham, Alabama, in 1985. (Doc. 1 ¶ 8; doc. 57-1 at 30 [Plaintiff's Depo. at 117].)  She has never worked, applied for a job, or even considered working anywhere other than the VA.  (Doc. 57-1 at 18, 30 [Plaintiff's Depo. at 69-70, 117].)

Until 1996, Curry worked as a program assistant in the VA's outpatient substance abuse clinic. (*Id*. at 11, 12 [Plaintiff's Depo. at 43, 45-46, 48].)  There, she kept track of the administrative part of the clinic – admitting patients, assigning them a therapist, and maintaining data on patient numbers.  (*Id*. at 12 [Plaintiff's Depo. at 46]; *see generally* doc. 57-12 at 2-4 ["major duties" of a program clerk/typist in Psychological Services].)  The program assistant position was a GS-4.  (Doc. 57-1 at 12 [Plaintiff's Depo. at 47-48].)

However, in 1996, Curry went on worker's compensation due to depression and anxiety.  (*Id*. at 12, 14 [Plaintiff's Depo. at 48, 55].)  In her worker's compensation claim, she alleged that the VA patients who came in for therapy "hit on [her] all the time," meaning they made "romantic overtures" or harassed her.  (*Id*. at 11 [Plaintiff's Depo. at 43-44].)  She also claimed, "Because [she] rejected his advances, [her supervisor] started making life difficult."  (*Id*. [Plaintiff's Depo. at 44].)  "In May 1997 the Federal Office of Worker's Compensation Program [OWCP] accepted [Curry's] claim for prolonged chronic depressive reaction (chronic depression)[,] placed her on total disability[,] and removed her from her employment with the [VA]."  (Doc. 1 ¶ 9; *see also* doc. 57-1 at 17 [Plaintiff's Depo. at 67-68].)  While Curry was receiving worker's compensation benefits, she received Social

4

Security Disability benefits, which made up for the difference between worker's compensation and total disability. (Doc. 57-1 at 13 [Plaintiff's Depo. at 50].)

Curry testified that she has been on medications for depression, sleep, and anxiety since she went out on worker's compensation. (*Id*. at 3 [Plaintiff's Depo. at 9-10].) She believes the medications are effective and, when taking the medications, her "medical conditions" do not "make it impossible for her to work" or "affect [her] day-to-day functioning in any other way." (Doc. 57-1 at 3 [Plaintiff's Depo. at 11].) With regard to whether she is "disabled," Curry stated:

> Q.  . . .  [A]re you disabled?
>
> A.  That's my answer.  It's a disability.  And that's my answer.
>
> Q.  Okay.  It's a disability.  What's a disability?
>
> A.  Depression and anxiety.
>
> Q.  And are you disabled as a result of depression and anxiety?
>
> A.  It's a disability.
>
> Q.  Well, you need to testify on the record whether you believe that you're disabled.  Do you, Adrienne Curry.
>
> A.  I have a condition that I live with.  So that's my answer.
>
> Q.  So you have a medical condition that you live with.
>
> A.  Yes.
>
> Q.  How does it affect your living?
>
> A.  Well, you know, you're able to function but you have, you know, your peaks and valleys.  You know, it's something you live with.

Q.  Does it impair your day-to-day activities?

A. Sometimes.

Q.  Describe how it does.

A.  You know, you just get down and blue, you know, and sometimes you get stressed and it's hard to sleep, you know, because you're constantly being mistreated so . . .

Q.  Anything else other than getting down and blue?

A.  That's enough, I would think.

Q.  Do you ever get so down and blue that you can't go to work?

A.  That's kind of hard to say.  That's kind of hard to say.

Q.  So not in recent memory that you know?

A.  You know, there have been times when, you know, your – you know, if you're, you know, harassed at work constantly, you just don't feel like going to work to face that so . . .

Q.  So your depression and anxiety stems from being mistreated and being harassed at work; is that what you're testifying to?

A.  Yes.  It can be exacerbated.  I'll put it that way. You know, it takes you back.

(*Id*. at 15 [Plaintiff's Depo. at 57-58].)[2]

Prior to her on-the-job injury, Curry had taken some nursing classes at Lawson State Community College in the 1990's.  (*Id*. at 6 [Plaintiff's Depo. at 22-23].)  While receiving disability and worker's compensation benefits, she attended nursing school and graduate

---

[2]As set forth herein, the court assumes, without deciding, that Curry can establish that she is a person with a disability as that term is defined by the Rehabilitation Act.

nursing school.  (Doc. 57-10 at 8.)   She received a Masters of Nursing Administration in 2008.  (Doc. 57-1 at 5-6 [Plaintiff's Depo. at 20-21].)

On or about December 4, 2008, Plaintiff filed an EEO complaint regarding her unsuccessful attempts to return to work in October 2008.  (Doc. 57-1 at 19-20 [Plaintiff's Depo. at 76-77]; doc. 57-9 [her EEO Complaint states, "I have attempted to return to work and have tried to seek assistance regarding the proper procedure in doing so.  I have been ignored.  I have been unable to get any assistance.  I was once told 'what make[s] you think they would want you back?'"].)  She also alleged that the VA was harassing her "by having private investigators . . . follow[ ] [her] absolutely 'everywhere'."  (Doc. 57-9.)  Thereafter, Curry filed a civil action, which was dismissed; the dismissal of her claims based on her 2008 EEO Complaint was affirmed by the Eleventh Circuit.  *Curry v. Shinseki*, No. 2:09-CV-02441-AKK, 2011 WL 13129972 (N.D. Ala. Aug. 31, 2011), *aff'd in part, vacated in part* 518 Fed. Appx. 957 (11th Cir. 2013).[3]

In early 2009, Tara Encalade, a VA Human Resources Specialist, sent a request to the OWCP for updated medical evidence for Curry's worker's compensation file.  (Doc. 57-14 at 3 [Encalade Test. at 7-8].)  The OWCP requires a federal agency to have updated medical evidence describing an employee's medical limitations before the agency may make a job

_____

[3]The Eleventh Circuit reversed the district court's decision to reach the claims "based on post-December 5, 2008 conduct and her 2010 EEO complaint. *See Curry*, 518 Fed. Appx. 957, 966-67 (11th Cir. 2013).  The claims set forth in Curry's 2010 EEO complaint are the subject of the instant action.  (*See* doc. 1 ¶ 28.)

offer after total disability has ended. (Doc. 57-3 at 5, § 8-4(A).)[4] The VA was required to look at its employees receiving worker's compensation "on a regular basis and try to . . . keep their case file[s] current and up-to-date." (Doc. 57-14 at 3 [Encalade Test. at 6].)

On May 13, 2009, Lyle Shehi, M.D., examined Curry and prepared a Work Capacity Evaluation, Psychiatric/Psychological Condition, and an accompanying report. (*See* doc. 57-2; *see also* doc. 57-14 at 4 [Encalade Test. at 10].) Dr. Shehi stated, in part:

> [Curry]] maintains . . . this very broad persecutory delusional system regarding the VA, and yet she only seeks to return to work for the VA. I had attempted to go around her defenses and suggest that she might work for other people and certainly with her education now, one would think that she could, but she says that she has so much time tied up in the VA, that the VA was the only place she would want to work and she did not want to start over anywhere so she would have some 20 years of service in the VA if she were able to return to the VA system.
>
> . . .

---

[4]This section states:

8.4 Reemployment with the Agency

When the medical evidence shows that total disability has ended the agency is encouraged to consider reemployment. The following procedures apply to all employees still on the agency's rolls, regardless of how long they have received compensation.

    A. Medical Evidence. To make a job offer the agency will need medical evidence describing the employee's medical limitations. (In some cases OWCP can provide this information.) Medical reports which address current limitations will usually suffice for this purpose. . . .

(Doc. 57-3 at 5, § 8.4(A).)

. . . [S]he is markedly delusional now.  She feels constantly followed.  [S]he feels that people from the VA have broken into her home to steal things from her and this delusional system is well crystallized and almost impenetrable to any psychotherapy as she will find a way to incorporate everything into this delusional system regarding the VA.

. . .

I would think that the patient should be able to function in a vocational rehabilitation program.  Her delusional system surrounds the VA.  She is preoccupied with returning to work with the VA in a nursing role and tells me right up front that she wants to go back to work.  My guess is that she succeeded with these [education] programs because she took them with low class loads and that she studied diligently, perhaps a lot harder than others in her class[,] to obtain her degree.  If she were reemployed by the VA as an RN and the VA chose to use her master's degree in some administrative way, it would be interesting to see if she somehow incorporates that into her delusional system.

. . .

I would think that if she could be put in some type of vocational rehabilitation program it would be in her best interest and allow her to gradually work herself back into the workforce.  She has not been in the workforce now for some 13 years.  She has completed a master's degree but she has never really worked in a hospital setting other than through her clerkships and her nursing school.  This might have to be a transition and may have to be with a vocational rehab program set up at some other facility other than the VA where she can make some contacts and hopefully begin to use her master's degree that she has been able to finish.

(Doc. 57-2 at 5-7.)  Based on his evaluation, Dr. Shehi found that Curry could work "4 hour workdays with a gradual increase over time," that he did "not think she would work as a

clerk,"[5] and an "alternative work location" outside the VA "should be in a nursing role." (*Id*. at 8.)

Under the OWCP Guidelines, "[t]he [reemployment] position should be compatible with the employee's medical condition." (Doc. 57-3 at 6, § 8.4(C).) "If the employee is expected to return eventually to the job held at the time of injury, the agency may offer light, limited or modified duty pending for recovery." (*Id*. § 8.4(B).) However,

> If the residuals of the injury will prohibit the employee from returning to the position held at the time of injury and the employee has received compensation for more than one year, the agency should consider reemployment in the following order of preference:
>
> (1) Return to the position held at the time of injury with modifications to accommodate the employee's limitations;
>
> (2) Employment in another position at the same salary as the position held at the time of injury; or
>
> (3) Employment in another position at a lower salary than the position held at the time of injury.

(*Id*.) The policies of the OWCP and the VA are to get employees off of worker's compensation and back in a position close to the position they held when they went out on worker's compensation. (Doc. 57-7 at 4 [Ward's Test. at 11]; doc. 57-14 at 4 [Encalade Test. at 11-12]; *see also* doc. 57-3 at 6, §§ 8.4 (B)-(C).) Albert Ward, Supervisor of Labor Relations at the Birmingham VA, testified that he was primarily concerned about getting

---

[5]In response to a question regarding whether Curry was "competent to perform [her usual job," he stated he did "not think she *will* work as a clerk." (Doc. 57-2 at 8 [emphasis added].) Consequently, he "suggest[ed] somehow trying to use her Master's Degree in nursing." (*Id*.) Specifically, Dr. Shehi did not find that Curry was *unable* to work as a clerk.

Curry back to work as close to her prior grade and level as possible. (Doc. 57-7 at 2, 4 [Ward's Test. at 4, 10-11].) However, he stated that Curry could apply for any position she wanted if she had the qualifications.[6] (*Id*. at 4 [Ward's Test. at 11]; *see also* doc. 57-14 at 4 [Encalade Test. at 12].)

An entry-level nursing position, a "novice" nurse, does not require previous nursing experience. (Doc. 62-3 at 32 [McDuffie's Depo. at 31]; *see* doc. 57-1 at 10 [Plaintiff's Deposition at 39-40].) The VA recruits nurses on an ongoing basis. (Doc. 62-3 at 54 [McDuffie's Depo. at 53].)

Curry was referred to vocational rehabilitation counselor, Lori Hodge, on or about June 3, 2009. (Doc. 57-1 at 20-21 [Plaintiff's Depo. at 79, 81-82]; *see* doc. 57-13 at 1.) Hodge had a contract with OWCP to provide rehabilitation services to Curry. (*See generally* doc. 57-13.) Less than one month passed between Curry's work capacity evaluation and her referral to Hodge for vocational rehabilitation services. (Doc. 57-1 at 23-24 [Plaintiff's Depo. at 92-93].)

Curry understood, and expected, that the VA would try to find her a position with the limitations and recommendations of Dr. Shehi's work capacity evaluation. (*Id*. at 21-22 [Plaintiff's Depo. at 84-85].) Also she understood that her return-to-work may not be to the same position with the same pay scale and promotion prospects as her prior position because that position may not be available. (*Id*. at 22 [Plaintiff's Depo. at 85].) The only request for

---

[6]Curry did not speak to anyone at the VA about an application for a nursing position she submitted in 2009. (Doc. 57-1 at 29 [Plaintiff's Depo. at 113-14].)

accommodation made on her behalf was the recommendation in Dr. Shehi's work capacity

evaluation –

> Q. Did you ever make a request for accommodation to the VA?
>
> . . .
>
> A. It was – it goes – basically, what I said, you know, when I was applying, it was what the doctor recommended. What he recommended. I don't recall anything else past that.

(*Id*. at 34 [Plaintiff's Depo. at 133].)

When Ward was notified sometime in 2009 that there had been a change in Curry's

medical restrictions and that she may be capable of returning to work, he started looking at

the possibility of getting her back to work. (Doc. 57-7 at 4 [Ward Test. at 9].) The work

capacity evaluation recommended four-hour workdays with a gradual increase over time, but

it did not expressly state when Curry would be able to work a full-time shift of eight to

twelve hours. (*See* doc. 57-2 at 8.) Ward and Encalade searched for a position at the VA that

Curry could perform based on her past employment and her limitations, which was standard

procedure; Encalade testified:

> . . . [W]hen I [get] the report back that she had work capacity, . . . I always have to go through HR to see what sort of vacancies we have and we had – we met about it, and it was a meeting held between myself, [Ward, her supervisor], the Associate Director, and [the VA's] HR Chief and another Labor Relations person. And we were brainstorming to see if we had any vacancies, and . . . where we could possibly place her or put her – offer her a job.
>
> So from that meeting it was determined that at that particular time we didn't have anything.

Q. And so was that determination made by the Assistant Director because there was no –

A. The Associate Director, the HR Chief [Sam Evans], and my immediate supervisor [were] there at the meeting, and the consensus was that there was nothing based on the vacancies at the time.

(Doc. 57-14 at 5-6 [Encalade's Test. at 16-17].) As for Curry being offered a nursing position, Ward testified:

Q. Now, the [work capacity] evaluation recommended that . . . she has a master's degree, nursing, and you indicated earlier that . . . it wasn't something that you had considered, . . . placing her in to the nursing position. Am I right?

A. No, I mean, if she wanted to apply to be a nurse, then . . . you wouldn't transfer . . . . Let's say she was a GS-5 and . . . there's an announcement for another GS-5 or GS-6 position that . . . you just ask to transfer over, obviously, and I don't need to explain that to you. I mean, nursing especially – nursing . . . is obviously a whole lot different than what she was doing [as a clerk]. And if she had the qualifications to become a nurse, then she [could] apply for a nurse position just like anybody else.

(Doc. 57-7 at 6 [Ward's Test. at 19-20].) As Encalade stated:

. . . [W]hat we would want to do [for Curry] is at least get her employment in the capacity that she was before she was injured or before she filed her claim, at least offer her something compatible or closely connected to the type of position she was in. But, once she returned to work certainly she could apply for any position she wanted to.

(Doc. 57-14 at 4 [Encalade Test. at 11-12].) The obligation to return Curry to a position similar to the one she had before her worker's compensation injury comes from the Department of Labor regulations regarding worker's compensation. (*Id*. [Encalade Test. at 12].) At the time of Dr. Shehi's evaluation, the VA did not have any part-time RN positions. (*Id*. at 6 [Encalade's Test. at 17].)

In her deposition, Curry testified, "[The VA has] hired nurses in part-time positions and flexi-pools and stuff, and I could have done that. Nurses come in and work four hours all the time. You pull somebody from the flexi-pool to come in and work four hours." (Doc. 57-1 at 36 [Plaintiff's Depo. at 141].) She also submitted an affidavit from Yvette Johnson, an RN employed at the VA from 1995-1997, who testified that she was "aware that VA maintains a flexi-pool of nurses who are made available to report to work to cover uncovered shifts and portions of shifts when an RN cannot be present to cover that particular position on a given shift," and that she was "also aware that during the period of time from 1995 through my departure in 1997, an RN was given accommodation for Irritable Bowel Syndrome [and] VA allowed her to work partial days when necessary." (Doc. 62-1 ¶¶ 7-8.) Doris Blue, a VA employee from 1972 until 2004, testified that, at the VA Hospital, "The Nurse Managers routinely got other nurses who worked on the floor to cover uncovered shifts or to cover partial shifts by coming in early or leaving later." (Doc. 62-1 ¶ 5.) Although Curry was in orientation with a nurse who told her she was hired to work "part time," Curry testified that nurses from the flexi-pool working a four-hour shift was not a regular occurrence and she had no personal knowledge of any nurse working a regular four-hour shift:

> A. She said she was working part-time.
>
> Q. What were her shifts?
>
> A. Oh, I mean, I didn't know her. I met her in orientation.

Q.  So you don't know how she was actually employed; you just sat with her in orientation, right?

A.  Yes.  She said she was working part-time over here.  Like, I'm working over here part-time.

Q.  And you said on the weekend, right?

A.  No.  What I said was that VA had people who would work weekend shift or evening shift or something like that.

Q.  And those were full 12-hour shifts, right?

A.  I don't know.  I mean, they wouldn't necessarily be 12-hour shifts. They could be 8-hour shifts.

Q.  Well, you don't know, right?  You don't know what kind of shifts these people worked, right?

A.  Well, when I was actually employed as a nurse, we had nurses that were on the floor and they worked eight hours or twelve hours.  It just depended on what the agreement would be, I guess.

Q.  Did you ever have a nurse who worked a 4-hour shift?

A.  Well, yes, they would, because if a patient – if a nurse had to leave early or something like that, they would call a nurse in to work.

Q.  But that was an irregular circumstance, right?

A.  Oh, okay, yes.

Q.  So you don't know anyone who worked regularly 4-hour nursing shifts at the VA, do you?

A.  Oh, I don't – I don't know.

Q.  You've never seen that in your personal knowledge, right?

A.  Oh, my personal knowledge, no.

(Doc. 57-1 at 28-29 [Plaintiff's Depo. at 111-13].)

Following the work capacity evaluation, when Curry sought to return to work, she needed a part-time position and the VA did not have a part-time position available. (Doc. 57-14 at 5-6 [Encalade's Test. at 13-14, 17, 19].) Curry's evidence does not support a finding of fact that – between May 2009 (the date of Curry's work capacity evaluation) and June 2010 (the date of Encalade's testimony regarding Curry's claims) – the VA had an available position for a novice nurse working a regular four-hour shift.

On or about July 17, 2009, Ward sent a letter to Hodge, Curry's vocational rehabilitation counselor, stating:

> Based on the sensitivity of the medical evidence presented, in regards to Ms. Curry, the Agency has come to the conclusion that suitable employment is not available for her. The Agency does not want to risk placing Ms. Curry in an environment that could cause her undue stress. Therefore we're requesting that you continue your search in locating gainful employment for her, in the private sector, by utilizing all areas of experience that she has.

(Doc. 57-5 at 1.)

In September 2009, Hodge told Curry that the VA did not have a position for her to return to work. Shortly thereafter, Curry made an informal EEO complaint; on or about January 6, 2010, she filed a formal EEO complaint. (*See* doc. 57-8 at 1.) Her EEO complaint described her alleged disability discrimination as occurring on September 22, 2009, and –

> On Sept[ember] 22, 2009, I learned from Lori Hodge, Voc[ational] Rehab[ilitation] Counselor with OWCP that VA. [had] informed her that it could not give me reasonable accommodations by re-employing me into a part-

16

time position. The VA was in possession of the doctor certifying I could return to work on a part-time basis that would grow into full-time employment.

(*Id.*) As for her retaliation claim, also occurring on September 22, 2009, Curry stated:

At the time I learned that the VA Hospital would not allow me to return to work, I was engaged in pursuing a claim against the VA for harassment and reprisal. I learned that when the VA said it did not have suitable employment available, I saw that VA had hundreds of job openings in the nursing field. Their reason for not reinstating me was a pretext for discrimination and retaliation.

(*Id.*)

In October 2010, the VA reemployed Curry as a patient escort/nursing assistant, a position equivalent to her former job as a program assistant. (Doc. 57-1 at 13, 30 [Plaintiff's Depo. at 49, 118].) Curry testified that she believes she was brought back to work *because* she had filed EEO complaints. (*Id.* at 35 [Plaintiff's Depo. at 137, 140].) The nursing assistant position is a GS-4 level, the same GS level as the program assistant position. (*Id.* at 30 [Plaintiff's Depo. at 118].) Nursing assistants are part of the VA's nursing service. (*Id.* at 31 [Plaintiff's Depo. at 124].)

Curry worked four hours or less per day when she returned to work. (*Id.* at 30-31, 32 [Plaintiff's Depo. at 120-21, 128].) In April 2011, the VA increased Curry's hours per shift to six, with her physician's approval. (*Id.* at 32 [Plaintiff's Depo. at 126].) Almost a year later, the VA increased her work hours to an eight hour shift. (*Id.* at 32, 33 [Plaintiff's Depo. at 127, 129-30].) Shortly thereafter, in June 2012, the VA selected Curry for a nursing position. (*Id.* at 33 [Plaintiff's Depo. at 131].)

The VA paid Curry $48,000 a year as a Nurse I/Level 1. (*Id*. at 10 [Plaintiff's Depo. at 37].) Nurse I is a novice nurse, with no experience upon hiring. (*Id*. at 10 [Plaintiff's Depo. at 40].) As a nurse on the medical/surgical floor, Curry worked a 12-hour shift. (*Id*. at 8, 28 [Plaintiff's Depo. at 31, 112].) Most nurses work 12-hour shifts when they work on the floor. (*Id*. at 9 [Plaintiff's Depo. at 33].) After working about two years as a nurse on a medical/surgical floor, the VA promoted Curry; she currently works as a case manager. (*Id*. at 8, 9 [Plaintiff's Depo. at 29, 36].)

## III. <u>DISCUSSION</u>

### A. AMERICANS WITH DISABILITIES [the ADA]

Curry's Complaint alleges four claims, each based on both the ADA and the Rehabilitation Act. (*See* doc. 1 at 8, 9, 11, 12.) Under the ADA, "[t]he term 'employer' does not include – (i) the United States [or] a corporation wholly owned by the government of the United States . . . ." 42 U.S.C.A. § 12111(5)(B)(i). "The United States, therefore, is not a covered entity under the ADA. 42 U.S.C. § 12111(2). Accordingly, the Secretary of the VA may not be held liable for a violation of the ADA." *Dockery v. Nicholson*, 170 Fed. Appx. 63, 65 (11th Cir. 2006);[7] *see also Frazier v. Sec'y, Dep't of Health & Human Servs.*, 710 Fed. Appx. 864, 865 n.1 (11th Cir. 2017)(plaintiff cannot bring claims under the Americans with

_____

[7]Eleventh Circuit Rule 36-2 provides, in pertinent part, "An opinion shall be unpublished unless a majority of the panel decides to publish it. ***Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority***." 11th Cir. R. 36-2 (emphasis added).

Disabilities Act "because she is a federal employee suing the federal government" (citing 42 U.S.C. § 12111(5)(B))).

To the extent Curry claims the VA violated her rights under the ADA, those claims will be dismissed. Nevertheless, "[the Eleventh Circuit has] observed that the Rehabilitation Act expressly adopts the same liability standards as the ADA, and, therefore, whether the Secretary would be liable under the ADA is relevant to [Curry's] Rehabilitation Act claim[s]." *Dockery*, 170 Fed. Appx. at 65 (citing, *inter alia*, *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); internal citations omitted); *see* 29 U.S.C. § 794 ("The standards used to determine whether this section has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201 to 12204 and 12210), as such sections relate to employment.").

## B. REHABILITATION ACT

Curry's Complaint alleges four claims: (1) failure to reinstate her based on her disability, (2) failure to accommodate her based on her disability, (3) failure to reinstate her in retaliation for her protected activity, and (4) failure to accommodate her in retaliation for her protected activity. (Doc. 1.) For the reasons set forth herein, the court finds that the VA is entitled to judgment as a matter of law because Curry has failed to submit evidence that a position as a clerk or novice nurse working a shift of four hours or less was available during the relevant time period.

### 1. Disparate Treatment

The Rehabilitation Act prohibits discrimination "under any program or activity conducted by any Executive agency," such as the VA, against any "otherwise qualified individual with a disability . . . solely by reason of her . . . disability." 29 U.S.C. § 794(a); *see* 38 C.F.R. § 15.140 ("No qualified individual with handicaps shall, on the basis of handicap, be subject to discrimination in employment under any program or activity conducted by [the Department of Veterans Affairs]."). Claims of employment discrimination based on a disability can be proven "through (1) direct evidence, (2) circumstantial evidence, or (3) statistical proof." *Paye v. Sec'y of Def.*, 157 Fed. Appx. 234, 236 (11th Cir. 2005)(citing *Earley v. Champion Int'l Corp.*, 907 F.2d 1077, 1081 (11th Cir. 1990)). In this case, Curry argues that she has direct evidence of discrimination, as well as circumstantial evidence.

### a. Direct Evidence

"Direct evidence of discrimination is 'evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee' and 'that, if believed, proves the existence of a fact without inference or presumption.'" *Hamilton v. Southland Christian School, Inc.*, 680 F.3d 1316, 1320 (11th Cir. 2012)(quoting *Wilson v. B/E Aerospace, Inc.*, 376 F.3d 1079, 1086 (11th Cir. 2004)); *see also Damon v. Fleming Supermarkets*, 196 F.3d 1354, 1358-59 (11th Cir. 1999)("We have defined direct evidence of discrimination as evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the

employee.)(internal quotations and citations omitted). "Only the most blatant remarks, whose intent could be nothing other than to discriminate . . . constitute direct evidence of discrimination." *Carter v. Miami*, 870 F.2d 578, 582 (11th Cir. 1989).

Curry contends:

Albert Ward[,] the Supervisor of Labor Relations at the Birmingham VA, on July 17, 2009, sent a letter to Lori Hodge, Rehabilitation Counselor for Ms. Curry[,] that stated:

> [I]n regards to Ms. Curry, the agency has come to the conclusion that suitable employment is not available for her. The agency does not want to risk placing Ms. Curry in an environment that could cause her undue stress. Therefore, we are requesting that you continue your search in locating gainful employment for her, in the private sector, by utilizing all areas of experience that she has.

(Doc. 57-5, Dx. 5) As the letter indicates, Ms. Curry was seeking re-employment. Ward used Ms. Curry[']s medical conditional as a reason for denying her employment, even after her medical doctor had cleared her for re-employment.

(Doc. 62-4 at 10-11.)[8]

In this case, the evidence is not disputed that Curry's Work Capacity Evaluation recommended that she return to work on a four-hour shift due to the fact that she had not worked in thirteen years and noted that she may benefit from a rehab assignment outside the agency because of her delusions regarding the VA. (Doc. 57-2 at 8.) Indeed, Dr. Shehi

---

[8]Curry also argues that "the Rehabilitation Act *required* reinstatement of employment with VA not employment in the private sector." (Doc. 62-4 at 11 [emphasis added].) However, no legal support for this argument is cited, and none has been found, that reinstatement with the VA is required under the Rehabilitation Act.

noted that working at the VA may not be in her best interest. (*Id*. at 7.) Given these limitations and/or qualifications on Curry's work capacity, Ward's statements – that work was not "available," followed by the separate statement that the VA did not want to create "undue stress" – are not so "blatant, unequivocal, and unconditional" that his "intent could be nothing other than to discriminate" against Curry on the basis of her disability. *See Carter*, 870 F.2d at 582. Indeed, Ward's statements are based on the language of Dr. Shehi's evaluation and do not indicate that he intended to deny Curry reinstatement to an available position because of her disability.

The court finds that Ward's letter is not direct evidence of disability discrimination by the VA.

### b. Circumstantial Evidence

"In the absence of direct evidence, a plaintiff may prove disparate treatment in disability cases through circumstantial evidence using the familiar burden-shifting analysis employed in Title VII employment discrimination cases." *Monaco v. City of Jacksonville*, 51 F. Supp. 3d 1251, 1258 (M.D. Fla. 2014)(quoting *Nadler v. Harvey*, No. 06-12692, 2007 WL 2404705, at *4 (11th Cir. Aug. 24, 2007)(quoting *Wascura v. City of S. Miami*, 257 F.3d 1238, 1242 (11th Cir. 2001))), *aff'd*, 671 Fed. Appx. 737 (11th Cir. 2016).

> *McDonnell Douglas* and subsequent decisions have established an allocation of the burden of production and an order for the presentation of proof in . . . discriminatory-treatment cases. First, the plaintiff must establish a prima facie case of discrimination. . . . The burden [then] shift[s] to [the defendant] to produce evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason. This burden is one of production, not persuasion; it can involve no credibility assessment. [When

the defendant offers] admissible evidence sufficient for the trier of fact to conclude that [the plaintiff] was fired [for a legitimate, nondiscriminatory reason], the *McDonnell Douglas* framework – with its presumptions and burdens – disappear[s], and the sole remaining issue [is] discrimination vel non . . . .

    Although intermediate evidentiary burdens shift back and forth under this framework, the ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.  And in attempting to satisfy this burden, the plaintiff--once the employer produces sufficient evidence to support a nondiscriminatory explanation for its decision--must be afforded the opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination. That is, the plaintiff may attempt to establish that he was the victim of intentional discrimination by showing that the employer's proffered explanation is unworthy of credence.

*Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 142-43 (2000)(internal citations and quotations omitted).

"To establish a prima facie case of discrimination under the Rehabilitation Act, a plaintiff must show that (1) [she] has a disability, (2) [she] is otherwise qualified for the position, and (3) [she] was subjected to unlawful discrimination as a result of [her] disability."  *Boyle v. City of Pell City*, 866 F.3d 1280, 1288 (11th Cir. 2017)(citation omitted).  The court assumes that Curry can prove she has a disability because she has not submitted sufficient evidence to demonstrate an issue of fact as to whether she was "otherwise qualified" for a position as a clerk and/or a novice nurse working a shift of four hours or less.

"A person with a disability is 'otherwise qualified' if [she] is able to perform the essential functions of the job in question with or without a reasonable accommodation.

'[T]he issue of whether an employee is an otherwise qualified individual and whether a reasonable accommodation can be made for that employee is determined by reference to a *specific position*.'" *Boyle*, 866 F.3d at 1288 (citing *Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 287 n.17 (1987) and quoting *Duckett v. Dunlop Tire Corp.*, 120 F.3d 1222, 1224-25 (11th Cir. 1997))(internal citations omitted; emphasis added).  With regard to a reasonable accommodation, "The employee has the burden of identifying an accommodation and demonstrating that it is reasonable.  . . .  Moreover, an employer's 'duty to provide a reasonable accommodation is not triggered unless a specific demand for an accommodation has been made.'" *Frazier-White v. Gee*, 818 F.3d 1249, 1255–56 (11th Cir.), *cert. denied*, 137 S. Ct. 592 (2016).  "A plaintiff also may satisfy the third prong of a prima facie case of disability discrimination by showing that he suffered an adverse employment action, such as termination, because of his disability." *Boyle*, 866 F.3d at 1289.  Curry alleges that she was not selected for a position as a clerk or as a nurse following her Work Capacity Evaluation. The prima facie case for a disparate treatment non-selection claim requires plaintiff to show that "she applied for and was qualified for an *available* position." *Walker v. Prudential Prop. & Cas. Ins. Co.*, 286 F.3d 1270, 1274-75 (11th Cir. 2002)(citing *Walker v. Mortham*, 158 F.3d 1177, 1192 (11th Cir. 1998)(quoting *Patterson v. McLean Credit Union*, 491 U.S. 164, 186 (1989)))(emphasis added).  The Eleventh Circuit has held:

We agree that the ADA does not require reassignment without competition for, or preferential treatment of, the disabled.[9] The ADA provides that, subject to exceptions irrelevant here, an employer must reasonably accommodate a disabled employee. 42 U.S.C. § 12112(a), (b)(5)(A). But it does not say how an employer must do that. It offers a non-exhaustive list of accommodations that "may" be reasonable, and one item on the list is "reassignment to a vacant position." *See id.* § 12111(9)(B) ("The term 'reasonable accommodation' *may include* . . . reassignment to vacant position.") (emphasis added). The ADA does not say or imply that reassignment is always reasonable. To the contrary, the use of the word "may" implies just the opposite: that reassignment will be reasonable in some circumstances but not in others. . . .

Apart from the ADA's statutory construction, this Court's well-settled ADA precedent holds that "employers are only required to provide 'alternative employment opportunities reasonably available under the employer's existing policies.'" *Terrell v. USAir*, 132 F.3d 621, 627 (11th Cir. 1998)(quoting *Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 289 n.19, 107 S. Ct. 1123, 94 L. Ed. 2d 307 (1987)); *Frazier–White v. Gee*, 818 F.3d 1249, 1257 (11th Cir. 2016)("ADA does not require [employers] to reassign [disabled employees] in violation of its governing civil service rules."); *Davis v. Fla. Power & Light Co.*, 205 F.3d 1301, 1306 (11th Cir. 2000)("The ADA does not require accommodations . . . that contravene the seniority rights of other employees under a collective bargaining agreement.").

. . .

In concluding that the ADA only requires an employer allow a disabled person to compete equally with the rest of the world for a vacant position, this Court is cognizant that "the intent of the ADA is that an employer needs only to provide meaningful *equal* employment opportunities," and that "[t]he ADA was never intended to turn nondiscrimination into discrimination" against the non-disabled. *Terrell*, 132 F.3d at 627 (emphasis in original). Consistent with our holding, the Eighth Circuit in *Huber v. Wal–Mart Stores*, 486 F.3d 480, 483 (8th Cir. 2007) also concluded that the ADA "is not an affirmative action statute" and "only requires [the employer] to allow [the disabled employee] to compete for the job, but does not require [the employer] to turn away a

_____

[9]Standards established in ADA cases apply to cases brought pursuant to the Rehabilitation Act. *See* 29 U.S.C. § 794.

superior applicant." *See also Daugherty v. City of El Paso*, 56 F.3d 695, 700 (5th Cir. 1995) (holding that the ADA does not require disabled persons be given priority in hiring or reassignment over those who are not disabled.) (modified on other grounds by *Kapche v. City of San Antonio*, 304 F.3d 493, 494 (5th Cir. 2002)).

*United States Equal Employment Opportunity Comm'n v. St. Joseph's Hosp.*, 842 F.3d 1333, 1345-47 (11th Cir. 2016)(footnotes omitted; emphasis in original). "In providing reasonable accommodations [or making selection decisions] under the [Rehabilitation Act], employers are not required to change the essential functions of a position or to reassign an employee when no positions are ***available***." *Billups v. Emerald Coast Utilities Auth.*, 714 Fed. Appx. 929, 934 n.3 (11th Cir. 2017)(citing *Frazier-White*, 818 F.3d at 1256; *Willis v. Conopco, Inc.*, 108 F.3d 282, 284 (11th Cir. 1997))(internal citations omitted; emphasis added). "The Rehabilitation Act does not require an employer to create a position for a disabled employee." *Curry*, 518 Fed. Appx. at 964-65 (citing *Sutton v. Ladner*, 185 F.3d 1203, 1211 (11th Cir. 1999)(footnote omitted); *see Sutton*, 185 F.3d at 1211 ("The evidence was undisputed, however, that there are no 'light duty' construction analyst positions at the SBA. Nor is the SBA required to create such a position for Sutton. *Shiring* [*v. Runyon*], 90 F.3d [827,] 831 [(3d Cir. 1996)]('employers are not required to create positions specifically for the handicapped employee'); *Fedro v. Reno*, 21 F.3d 1391, 1395 & n.5 (7th Cir. 1994)(Rehabilitation Act does not 'require an employer to *create* alternative employment opportunities for a handicapped employee')(emphasis in original); [*Southeastern Community College v.*] *Davis*, 442 U.S. [397,] 406, 99 S. Ct. 2361 [(1979)](Rehabilitation Act does not require employer to change job requirements).").

26

After receiving Curry's Work Capacity Evaluation, Ward, Encalade, and Smith met to discuss whether a position was available at the VA that would accommodate Curry's work capacity and allow her to return to work. Encalade testified, unequivocally, that the VA did not have part-time clerk or entry-level nursing positions between the date of Dr. Shehi's evaluation and June 22, 2010. The record contains no evidence that novice nurses were hired into the flexi-pool or hired or allowed to work a regular or temporary shift of four hours or less. The only evidence upon which Curry relies on to support her claim for a four-hour shift is testimony from Yvonne Johnson, a former VA nurse, that sometime between 1995 and 1997 a nurse with irritable bowel syndrom was "allowed . . . to work partial days when necessary." (Doc. 62-1 ¶ 8.) Curry testified that she had no personal knowledge of any nurse working a regular four-hour shift and that, although a nurse may work a shift of four-hours or less this was an irregular circumstance. (Doc. 57-1 at 28-29 [Plaintiff's Depo. at 111-13].) Moreover, she testified that she had applied for and sought a full-time nursing position that would allow her to work in accordance with her functional capacity;[10] in other words, she sought a position wherein she could work a shift of four hours or less until she was medically cleared for full-time hours. Curry has not shown that a novice nurse position (or a clerk position), with a regular shift of four hours or less, was available between May 2009, the date of her work capacity evaluation, and January 2010, the date she filed her EEO complaint.

---

[10]Because Curry was not medically cleared to work a full-time shift, the availability of full-time novice nursing positions is not relevant to her disability and retaliation claims.

Therefore, Curry's disability discrimination claims based on failure to hire and/or accommodate her  by employing her in a novice nurse or clerk position with a shift of four hours or less will be dismissed.

## 2. Retaliation

"To prevail on her [Rehabilitation Act] retaliation claim, Plaintiff must show that:  (1) she engaged in a statutorily protected expression, (2) she suffered an adverse employment action, and (3) there was a causal link between the two. *Lucas* [*v. W.W. Grainger*], 257 F.3d [1249,] 1260 [(11th Cir. 2001)]." *Frazier-White v. Gee*, 818 F.3d 1249, 1258 (11th Cir.), *cert. denied*, 137 S. Ct. 592 (2016).  To establish an adverse employment action based on non-selection, "the plaintiff must demonstrate that (1) he or she 'applied for a particular position (2) which was vacant and (3) for which [he or] she was qualified and further that (4) he or she was not hired for that position." *Jones v. Alabama Power Co.*, Civil Action No. 2:06CV780-ID, 2007 WL 3496720, *9 (M.D. Ala. Nov. 14, 2007)(quoting *Velez v. Janssen Ortho, LLC*, 467 F.3d 802, 807 (1st Cir. 2006)(internal quotations omitted), *aff'd* 282 Fed. Appx. 780, 785 (11th Cir. 2008)("However, because it is undisputed that Jones did not reapply for any positions with Alabama Power after his termination, Jones cannot show that he suffered a materially adverse employment action and thus cannot make out his prima facie case."); *cited in Ritchey v. S. Nuclear Operating Co., Inc.*, Case No. 2:07-CV-1844-RDP, 2010 WL 11520488, *21 (N.D. Ala. Mar. 29, 2010), *aff'd*, 423 Fed. Appx. 955 (11th Cir. 2011).

As discussed above, Curry has not submitted evidence that a position for which she was qualified and which satisfied the limitations set forth in her functional capacities evaluation was available at the time Curry alleges the VA denied her request to return to work or denied her a reasonable accommodation. Therefore, Curry suffered no adverse action by not being selected to a non-existent position. Accordingly, she has failed to establish a prima facie case for retaliation for requesting an accommodation or non-selection after her 2009 functional capacity evaluation.

The VA's Motion for Summary Judgment as to Curry's Rehabilitation Act retaliation claims will be granted.

## <u>CONCLUSION</u>

For the foregoing reasons, the court is of the opinion that there are no material facts in dispute and defendant is entitled to judgment as a matter of law. An Order granting defendant's Motion for Summary Judgment, (doc. 58), will be entered contemporaneously with this Memorandum Opinion.

**DONE** this 15th day of March, 2019.

*Sharon Lovelace Blackburn*
SHARON LOVELACE BLACKBURN
UNITED STATES DISTRICT JUDGE